**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DENNIS ROSCOE,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| **v.** | : | **NO. 15-2118** |
| | : | |
| **WATCO COMPANIES, LLC, et al.,** | : | |
| **Defendants.** | : | |

**Jones, II        J.**

December 16, 2016

**MEMORANDUM**

 Dennis Roscoe worked for Watco Companies for six months before his termination on October 10, 2014. Roscoe alleges that during his brief tenure with Watco, he experienced instances of racial discrimination and unlawful retaliation. It is on the basis of these experiences that Roscoe brings the present suit against Watco Companies, its parent company Watco Transloading, and Defendant Brian Spiller, who worked as Roscoe's direct supervisor at all times material.  The named defendants timely moved for summary judgment on both of Roscoe's claims under 42 U.S.C. § 1981, which the court considers herein.

 For the reasons that follow, this Court rules defendants' Motion for Summary Judgment is granted in part and denied in part. This Court GRANTS the Motion as it pertains to Roscoe's claim of racial discrimination, and DENIES the Motion as it pertains to Roscoe's claim of retaliation.

**FACTUAL BACKGROUND**

 The facts of this case are undisputed in all material respects. The plaintiff, Dennis Roscoe ("Plaintiff"), is a forty-year-old African-American man. (Pl. SMDF ¶1; Def. R. Pl. SMDF ¶1).  On

April 4, 2014, Plaintiff began working for Watco Companies ("Watco")[1], a short lined railroad company that maintains a rail operation at the Philadelphia Energy Solutions ("PES") refinery in Philadelphia. (Pl. SMDF ¶ 2, 3; Def. R. Pl. SMDF ¶ 2, 3). PES orders crude oil from around the country, which is transported by rail to its Philadelphia refinery. (Def. SUMF ¶ 3; Pl. R. Def. SUMF ¶3). Once the trains carrying the oil arrive at PES's Philadelphia facility, Watco assumes control of the trains and facilitates the process of unloading the oil. (Def. SUMF ¶ 4, 5; Pl. R. Def. SUMF ¶ 4, 5). Watco workers are responsible for managing all the railcars in use, and inspecting and repairing the trains while the oil is unloaded. (Def. SUMF ¶ 4, 5; Pl. R. Def. SUMF ¶ 4, 5). When Plaintiff was hired, the Watco team consisted of terminal manager Defendant Brian Spiller ("Spiller"), four shift supervisors, and numerous engineers, conductors, brakemen, and carmen. (Def. SUMF ¶ 7; Pl. R. Def. SUMF ¶ 7). Plaintiff was initially hired to work for Watco as an engineer, but within a month of working for the company, Plaintiff was transferred to the position of carman. (Pl. SMDF ¶ 8; Def. R. Pl. SMDF ¶8). As a carman, Plaintiff was responsible for conducting inspections of the trains, completing paperwork detailing each railcar inspected and identifying any discovered defects, and making any necessary mechanical repairs. (Def. SUMF ¶16; Pl. R. Def. SUMF ¶ 16). Plaintiff worked as a carman until his termination on October 10, 2014. (Pl. Ex. P). In the three months preceding Plaintiff's termination, Plaintiff filed two complaints of racial discrimination, filed one complaint of retaliation, and was sanctioned for three alleged professional infractions. The court considers each complaint and each infraction in turn.

   1. July 29, 2014 Complaint of Racial Discrimination

   On July 29, 2014, Plaintiff sent a letter to Defendant Spiller alleging that Watco engaged in racially discriminatory hiring practices. (Pl. SMDF ¶ 19; Def. R.  Pl. SMDF ¶ 19; Pl. Ex. I). In his

---

[1] Watco Transloading and its subsidiary Watco Companies are collectively referred to as "Watco" throughout this Opinion.

letter, Plaintiff claimed that the White carman was promoted to the position of lead carman while the three Black carmen were neither considered for the position nor informed that the position was open. (Pl. SMDF ¶ 20; Def. R. Pl. SMDF ¶ 20; Pl. Ex. I). At the time, Watco maintained an online system on which it generally posted available positions. (Pl. SMDF ¶ 21; Def. R. Pl. SMDF ¶ 21). The lead carman position was neither posted online nor advertised through Human Resources. (Pl. SMDF ¶ 21, 22; Def. R. Pl. SMDF ¶ 21, 22). Of the four carmen working for Watco in July of 2014, only a White carman – Michael Onuskanych (Mike O.) – was interviewed for the lead carman position. (Pl. SMDF ¶ 25; Def. R. Pl. SMDF ¶ 25). In his letter, Plaintiff also complained that two new White employees were hired to carman positions despite lacking the requisite "work experience, formal training, and certification." (Pl. SMDF ¶ 29; Def. R. Pl. SMDF ¶ 29; Pl. Ex. I).

In response to Plaintiff's letter, Defendant Spiller met with Plaintiff and the two other Black carmen. (Pl. SMDF ¶ 26; Def. R. Pl. SMDF ¶ 26). After the meeting with Defendant Spiller, Plaintiff forwarded his letter to Brooke E. Beasley ("Beasley"), an employee in Watco's Human Resources. (Pl. SMDF ¶ 31; Def. R. Pl. SMDF ¶ 31). Beasley did not investigate Plaintiff's allegations of discriminatory hiring practices at Watco. (Pl. SMDF ¶ 34; Def. R. Pl. SMDF ¶ 34).

2.  August 22, 2014 Disciplinary Action

On August 15, 2014, Defendant Spiller reported observing Plaintiff dallying in the break room and delaying the start of an inspection of a train. (Def. Ex. A, 52; Pl. Ex. J). Defendant Spiller instructed shift supervisor, Gary Plotts ("Plotts"), to ensure that Plaintiff went home at the end of Plaintiff's shift and did not work any overtime. (Def. Ex. A, 52). As Plotts' shift concluded before Plaintiff's, Plotts passed Defendant Spiller's message on to the incoming shift supervisor, Joe Ryder ("Ryder"). (Def. SUMF ¶ 27; Pl. R. Def. SUMF ¶ 27). At the conclusion of Plaintiff's shift, Ryder made numerous attempts to contact Plaintiff so that Plaintiff could timely end his

shift. (Def. SUMF ¶ 28; Pl. R. Def. SUMF ¶ 28). When Ryder finally reached Plaintiff, Ryder instructed Plaintiff to complete his work and then come to Ryder's office. (Def. SUMF ¶ 34; Pl. R. Def. SUMF ¶ 29). Ryder then informed Plaintiff of Defendant Spiller's instructions for Plaintiff to leave right at the end of his shift. (Def. SUMF ¶ 36; Pl. R. Def. SUMF ¶ 29). Despite this, Plaintiff remained on site well after the conclusion of his shift. (Def. SUMF ¶ 38; Pl. R. Def. SUMF ¶ 38). Plaintiff alleged that Ryder authorized Plaintiff to remain on site to complete mechanical repairs on a train. (Pl. SMDF ¶56; Def. R. Pl. SUMF ¶ 56).

That evening, Ryder contacted Defendant Spiller to apprise him of Plaintiff's actions, as Ryder perceived them. (Def. SUMF ¶ 39; Pl. R. Def. SUMF ¶ 39). Defendant Spiller asked Ryder to document the incident in an official statement. (Def. SUMF ¶40; Pl. R. Def. SUMF ¶ 40). In his statement, Ryder asserted that he explicitly told Plaintiff to go home, and that Plaintiff remained on site for ninety minutes following the conclusion of his shift. (Pl. Ex. J). Ryder's official statement characterized Plaintiff's actions as "[g]ross [i]nsubordination."  (Pl. Ex. J). Defendant Spiller, in consultation with Human Resources, decided to issue Plaintiff two warnings – one for "poor quality of work," and one for insubordination. (Def. SUMF ¶ 45; Pl. R. Def. SUMF ¶ 45). Both warnings were given to Plaintiff on August 22, 2014. (Def. SUMF ¶ 46; Pl. R. Def. SUMF ¶ 46).

### 3.  September 22, 2014 Complaint of Retaliation

On September 22, 2014, Plaintiff sent an email to Beasley informing her of alleged threatening remarks made by Plotts toward Plaintiff, as told to Plaintiff by Watco employee Carl Pinder ("Pinder"). (Pl. SMDF ¶ 67; Def. R. Pl. SMDF ¶ 67; Pl. Ex. S). In his email, Plaintiff claims that Pinder signed a statement – drafted by Plaintiff – detailing the specifics of Plotts' threats. (Pl. Ex. S).  The statement alleged that Plotts told Watco employees that their jobs were at

risk because Plaintiff filed a complaint with the Occupational Safety and Health Administration ("OSHA"). (Pl. Ex. S). According to the statement, Plotts suggested that the employees "take Roscoe out behind the trailer and do something about it." (Pl. Ex. S). Plaintiff indicated that he planned to hand deliver the statement Pinder signed to Defendant Spiller and forward said statement on to OSHA and a United Steel Workers representative. (Pl. Ex. S).

Upon receipt of Plaintiff's email, Beasley informed both Defendant Spiller and the Director of Human Resources, Sofrina Howard ("Howard"), about Plaintiff's complaint. (Pl. SMDF ¶ 68; Def. R. Pl. SMDF ¶ 68).

### 4.  October 1, 2014 Disciplinary Action

On September 23, 2014, Plaintiff was involved in a verbal altercation with Watco employee Joe Onuskanych ("Joe O."). (Pl. SMDF ¶ 69: Def. R. Pl. SMDF ¶ 69). The altercation began after Plaintiff told shift supervisor Brandon Lockley ("Lockley"), a Black man, that Plaintiff thought it was unfair that Lockley consistently offered Joe O. overtime. (Pl. SMDF ¶ 72, 78; Def. R. Pl. SMDF ¶ 72, 78). Plaintiff informed Lockley that Plaintiff planned to complain to Human Resources about the differential treatment. (Pl. SMDF ¶ 72, 78; Def. R. Pl. SMDF ¶ 72, 78). As Plaintiff was complaining to Lockley, Joe O. and his father Mike O. entered the room. (Pl. SMDF ¶ 79; Def. R. Pl. SMDF ¶ 79). A verbal altercation ensued, during which Plaintiff told Joe O. that Joe O. only had a job "because of his close relationship with management." (Pl. SMDF ¶ 83; Def. R. Pl. SMDF ¶ 83).

Joe O. complained to Defendant Spiller that during the argument, Plaintiff made crass comments and inappropriate sexual gestures. (Def. Ex. A, 60). Lockley separately complained to Defendant Spiller that Plaintiff was being insubordinate. (Def. Ex. A, 60; Def. Ex. D, 20). Defendant Spiller instructed Lockley to write an incident report documenting the conduct of each

employee involved in the altercation and the specifics of Plaintiff's alleged insubordination.  (Def. SUMF ¶ 49; Pl. R. Def. SUMF ¶ 49). In the report, Lockley stated that Plaintiff told Joe O. he was unneeded at work that day and that Joe O. should go home. (Def. SUMF ¶ 50; Pl. R. Def. SUMF ¶ 50). Lockley stated that he reminded Plaintiff that Plaintiff did not have the power to decide what employees were necessary. (Def. SUMF ¶ 54; Pl. R. Def. SUMF ¶ 54). Lockley further reported that he had to instruct Plaintiff several times to begin his work, and ultimately had to threaten to send Plaintiff home. (Def. Ex. D, 19). In response to this threat, Lockley reported that Plaintiff told Lockley that he "didn't have the balls to send [Plaintiff] home." (Def. Ex. D, 19).

After receiving Lockley's report, Defendant Spiller interviewed Plaintiff. (Def. SUMF ¶ 61; Pl. R. Def. SUMF ¶ 61). Plaintiff was sent home for the day. (Def. SUMF ¶ 61; Pl. R. Def. SUMF ¶ 61). Defendant Spiller then informed Howard of the incident and his communications with Lockley and Plaintiff.  (Def. SUMF ¶ 63; Pl. R. Def. SUMF ¶ 63). Howard traveled to Philadelphia to conduct onsite interviews of the parties involved and of witnesses. (Def. SUMF ¶ 64; Pl. R. Def. SUMF ¶ 64). Howard also conducted a follow up interview with Lockley. (Def. SUMF ¶ 65; Pl. R. Def. SUMF ¶ 65). Following her investigation, Howard produced a report indicating that she had determined that Plaintiff's comments regarding Joe O.'s relationship with management were accompanied by explicit, sexual gestures. (Def. Ex. F, 52, 53).  Howard further concluded that Plaintiff was insubordinate toward Lockley. (Def. SUMF ¶ 68; Pl. R. Def. SUMF ¶ 68). Howard forwarded her findings to Defendant Spiller and to Nathan Henderson ("Nathan"), Defendant Spiller's manager and the Vice President of Operations at Watco. (Def. SUMF ¶ 70, Pl. R. Def. SUMF ¶ 70). On October 1, 2014, Defendant Spiller and Henderson informed Plaintiff of their decision that Plaintiff should receive a final warning and be suspended. (Def. SUMF ¶ 72; Pl. R. Def. SUMF ¶ 72; Pl. Ex. L).

Plaintiff claimed that he never raised his voice at Joe O. or Mike O., that he never used obscene language or gestures, and that he was never insubordinate toward Lockley. (Pl. SMDF ¶ 84; Pl. SMDF ¶ 93; Pl. R. Def. SUMF ¶ 60). Plaintiff secured the sworn statement of Watco employee Greg Baranyay ("Baranyay"), which supported Plaintiff's account of the altercation. (Pl. Ex. O). According to Baranyay, not only was Plaintiff neither insubordinate nor unprofessional on September 23, 2014, but Watco "seem[ed] to retaliate against employees who complain to management or engage in activities that management does not agree with." (Pl. Ex. O).

5.  October 6, 2014 Complaint of Racial Discrimination

On October 6, 2014, Plaintiff filed a complaint of racial discrimination with the Equal Employment Opportunity Commission (EEOC). (Pl. SMDF ¶ 101; Def. R. Pl. SMDF ¶ 101). The complaint read, in pertinent part: "I personally believe that my complaint of discrimination (as aforesaid) caused a chain of events creating a hostile work environment, pretextual discipline, and my most recent lengthy suspension." (Pl. SMDF ¶ 104; Def. R. Pl. SMDF ¶ 104). At some point after officially submitting the complaint, Plaintiff informed Beasley of the EEOC filing. (Pl. SMDF ¶ 102; Def. R. Pl. SMDF ¶ 102).

6.  October 10, 2014 Disciplinary Action

Plaintiff returned from his suspension on October 6, 2014. (Pl. SMDF ¶ 113; Def. R. Pl. SMDF ¶ 113). On October 10, 2016, Watco employee Leroy Henderson ("Leroy") reported a verbal altercation between him and Plaintiff. (Def. SUMF ¶ 73; Def. Ex. A, 40; Def. Ex. D, 10). Leroy told Lockley that Plaintiff verbally accosted him, referring to Leroy as a "drunk" and a "junkie." (Def. Ex. D, 11). After hearing Leroy's account of what transpired, Lockley escorted Leroy to the employee trailer and attempted to contact Defendant Spiller, Nathan, and Watco's Human Resource department. (Def. Ex. D, 11). Before any further discussion of the incident could

take place, Lockley informally interviewed a PES security guard who witnessed the altercation, Sabrina Harris. (Def. Ex. D, 12). Lockley reported that Harris saw Plaintiff verbally assault Leroy for no apparent reason. (Def. Ex. D, 12). Harris provided a statement to that effect to Watco's Human Resources department. (Def. SUMF ¶ 92; Pl. R. Def. SUMF ¶ 92; Def. Ex. E, 79). Plaintiff denied saying anything to Leroy on October 10, 2014. (Pl. SMDF ¶ 73).

Following his on-site interview of Harris, Lockley called Howard and allowed her to speak directly with Leroy. (Def. SUMF ¶80; Pl. R. Def. SUMF ¶ 80). In his conversation with Howard, Leroy claimed that Roscoe called him obscene names and threatened Leroy's family, specifically his young daughters. (Def. Ex. F, 33). Leroy said much of the same in a subsequent discussion with Defendant Spiller about the incident. (Def. Ex. A, 42).  After his discussion with Leroy, Defendant Spiller conferred with Nathan and the two decided to terminate Plaintiff's employment. (Def. SUMF ¶ 95; Pl. R. Def. SUMF ¶ 95). Defendant Spiller notified Plaintiff of his termination by mail on or about October 10, 2014. (Def. SUMF ¶ 96; Pl. R. Def. SUMF ¶ 96). Plaintiff was replaced by another Black man, James Brock. (Def. SUMF ¶97; Pl. R. Def. SUMF ¶ 97.) Plaintiff initiated the present action against Watco Companies, Watco Transloading, and Brian Spiller on April 21, 2015.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts

showing that there is a genuine issue for trial." <u>Santini v. Fuentes</u>, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted).  Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.  "At the summary judgment stage of proceedings, courts do not 'weigh the evidence or make credibility determinations,' but, instead, leave that task to the fact-finder at a later trial if the court denies summary judgment."  <u>Halsey v. Pfeiffer</u>, 750 F.3d 273 (3d Cir. 2014) (quoting <u>Petruzzi's IGA Supermarkets v. Darling-Delaware Co.</u>, 998 F.2d 1224, 1230 (3d Cir. 1993)).

## DISCUSSION[2]

I.   **Defendant is Entitled to Judgment as a Matter of Law as to Plaintiff's Claim of Racial Discrimination.**

Plaintiff brings the present claim against Defendants for racial discrimination in violation of 42 U.S.C. § 1981. Plaintiff alleges that Defendants unlawfully terminated Plaintiff because of Plaintiff's membership in a protected class. This Court finds no genuine disputes of material fact as it pertains to Plaintiff's claim of race discrimination, so the question before the court is whether, as a matter of law, Defendant is entitled to judgment. For the purposes of summary judgment, the

---

[2] Plaintiff apparently intended to amend the Complaint to include identical claims of racial discrimination and unlawful retaliation under Title VII of the Civil Rights Act of 1964 and §951 of the Pennsylvania Human Relations Act, once each claim had been administratively exhausted before the EEOC and PHRC, respectively. As of the date of this Opinion, no such amendment has been filed, so this Court considers only Plaintiffs § 1981 claims. Moreover, because the Third Circuit approaches Title VII, PHRA, and §1981 claims identically, Plaintiffs claims under Title VII and the PHRA would be disposed of in the same manner as detailed herein.

legal standards for analyzing Plaintiff's § 1981 claim are the same as that which relates to Title VII claims of the same nature. Jones v. Sch. Dist. Of Phila., 198 F.3d 403, 409 (3d Cir. 1999). As with Title VII claims of employment discrimination, in the absence of direct evidence, a plaintiff may sustain a claim of racial discrimination in violation of § 1981 through the burden shifting framework delineated by the Supreme Court in McDonnell Douglass v. Green. 411 U.S. 792, 802 (1973); Jones, 198 F. 3d at 410 (applying the McDonnell Douglass framework to § 1981 claims of intentional discrimination). To prove race discrimination under McDonnell Douglass, the plaintiff must first establish a prima facie showing of discrimination. McDonnell Douglass 411 U.S. at 802. A prima facie case of intentional discrimination is found where the plaintiff demonstrates that (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the position or was performing the position satisfactorily; (3) plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination. Fekade v. Lincoln Univ., 167 F.Supp. 2d 731, 742 (E.D. Pa. 2001). If the plaintiff successfully establishes a prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate, non-discriminatory reason" for the adverse employment action. Id. at 741. Once the defendant presents a legitimate, lawful reason for its employment action, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason for its conduct was, in fact, pretext for unlawful discrimination. Id. Pretext can be proven by evidence that would lead a fact finder either to disbelieve the defendant's proffered reason for its employment action, or believe that invidious discrimination was more likely the cause of the defendant-employer's conduct. Jones, 198 F. 3d at 413. Where the plaintiff cannot establish a prima facie case of race discrimination, the claim necessarily fails. Sarullo v. United States Postal Serv., 352 F.3d 789, 799 (3d Cir. 2003).

A.     Plaintiff cannot make a prima facie showing of discrimination.

Under the McDonnell Douglass approach to proving unlawful discrimination, the plaintiff must establish his prima facie case of discrimination by a preponderance of the evidence. Fekade, 167 F.Supp. 2d at 740. For the purposes of the present Motion, Defendants acknowledge that Plaintiff can satisfy the first three elements of a prima facie showing of discrimination. (Def. Mot. Sum. J., 13). Plaintiff is a Black man, and is thus a member of a protected class. Plaintiff was qualified for the position of carman, and was arguably preforming satisfactorily in said position. Defendants' decision to terminate Plaintiff qualifies as an adverse employment action. All that remains in dispute is whether Plaintiff can make a showing, by a preponderance of the evidence, that his termination from Watco occurred under circumstances that give rise to an inference of discrimination.

1.     **The facts surrounding Plaintiff's termination do not give rise to an inference of invidious discrimination.**

Plaintiff can satisfy his burden of proof for the fourth element of the prima facie standard by presenting evidence upon which the court "can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons." Equal Emp't Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 348 (3d Cir. 1990). One such inference may be made where "the [plaintiff's] position is filled by a person not of the protected class." Jones v. Sch. Dist. of Phila., 19 F.Supp. 2d 414, 419 (E.D. Pa. 1998). Defendants argue that the fact that Plaintiff's replacement was also a Black man "fatally undermines [Plaintiff's] race discrimination claim." (Def. Mot. Sum. J., 13). This mischaracterizes precedent. While Defendant's subsequent hiring of a White replacement carman would certainly bolster Plaintiff's claim that Plaintiff was terminated because of his race, that Plaintiff's replacement was also Black is not dispositive. The fact that Plaintiff and his replacement were both members of the

same protected class "does not establish that [Defendants] did not fire [Plaintiff] on the basis of [his] protected status." Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 353 (3d Cir. 1999). If Plaintiff can demonstrate that Defendants were quicker to discipline Black employees than they were White employees, or that Plaintiff was treated less favorably than similarly situated White employees, the race of Plaintiff's replacement is immaterial. Id. at 353-354. Such disparate treatment is quintessentially race discrimination, "which [Defendants] cannot purge by hiring another person of the same race later." Id. at 353 (citing Carson v. Bethlehem Steel Corp., 82 F.3d 157 (7th Cir. 1996)).

The flaw in Plaintiff's race discrimination claim is not, therefore, the race of his replacement. The apparent flaw in Plaintiff's race discrimination claim is the deficiency of his comparator evidence. "The central focus of the inquiry in a case such as this is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" Id. at 352 (citing Furnco Construction Corp. v. Waters, 438 U.S. 567 (1978)). Where a plaintiff can demonstrate that similarly situated employees not of the same protected class were treated differently than was the plaintiff, the legitimate reasons for the employment action are eliminated and the court can infer the existence of invidious discrimination. Id. But to be similarly situated for the purposes of § 1981 claims, Plaintiff and his comparator(s) must be "similar in all relevant respects." Opstanik v. Norfolk S. Corp., 335 F.Appx. 220, 223 (3d Cir. 2009). The relevant respects "are determined by the context of each case, but often includes a 'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" Id.

Plaintiff alleges that he was treated less favorably than similarly situated White Watco employees, with specific reference to Mike O., Joe O., Joe's brother Kevin Onuskanych ("Kevin O."), and Plotts. Plaintiff claims that Mike O. was wrongfully considered for the position of lead carman, that Joe O. and Kevin O. were wrongfully afforded opportunities for overtime and paid on the same pay scale as more qualified Black carmen, and that Plotts engaged in threatening behavior for which he was never disciplined. (Pl. Resp., 26). But, Plaintiff fails to allege the facts necessary for this Court to consider any of the named comparators "similarly situated" to Plaintiff. First, Gary Plotts is not a suitable comparator because he worked as shift supervisor, a position superior to that which Plaintiff worked during his tenure at Watco. Second Plaintiff admittedly has no knowledge of the disciplinary histories of the Onuskanych workers, and no knowledge of their respective work experience. (Def. Ex. B, 201-204). Third and most importantly, none of the named comparators engaged in the kind of misconduct of which Plaintiff was accused and upon which Plaintiff's termination was allegedly predicated. Ultimately, Plaintiff fails to adduce sufficient evidence for this Court to find that the named comparators were similarly situated, let alone treated more favorably.

The prima facie case serves an important function in claims of unlawful employment discrimination, "it eliminates the most common nondiscriminatory reasons for the plaintiff's [termination]." Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 253-254 (1981). While Plaintiff correctly asserts that the burden of establishing a prima face case of disparate treatment is not particularly onerous, Id. at 253, the record is simply devoid of evidence that would sufficiently eliminate the common, nondiscriminatory reasons that could lawfully underlie Defendants' termination decision. Plaintiff cannot satisfy the fourth element of the prima facie standard and as such, his claim must fail.

Because Plaintiff fails to make a prima facie showing of unlawful discrimination, Defendants are entitled to judgement as a matter of law. This Court must therefore grant Defendants' Motion for Summary Judgment as to Plaintiff's claim of race discrimination under 42 U.S.C. § 1981.

II.     **Defendants are not Entitled to Judgment as a Matter of Law as to Plaintiff's claim of Retaliation.**

Plaintiff's second claim under 42 U.S.C. § 1981 alleges that Defendants unlawfully retaliated against Plaintiff because of his complaints of discriminatory treatment. Because the court finds no genuine disputes of material fact as it relates to Plaintiff's retaliation claim, the relevant inquiry is whether Defendants are entitled to judgment as a matter of law. Retaliatory employment action is actionable under 42 U.S.C. § 1981 where the basis of the employer's retaliation is the plaintiff's participation in protected activity. Estate of Oliva v. N.J. Dep't of Law & Pub. Safety, 604 F.3d 788, 798 (3d Cir. 2010) (citing CBOSC West, Inc. v. Humphries, 553 U.S. 442 (2008).  To prove a § 1981 claim of unlawful retaliation  using circumstantial evidence, Plaintiff must once again follow the burden shifting framework of McDonnell Douglass. Id. As described in the preceding section, Plaintiff has the initial burden of presenting a prima facie case of retaliation. Id. Following such a showing, the burden shifts to Defendants to articulate a legitimate and lawful reason for the adverse employment action at the heart of Plaintiff's claim. Id. If Defendants are able to articulate a legitimate and lawful reason for their conduct, Plaintiff is charged with demonstrating that Defendants' proffered reason for the employment action is pretext for impermissible retaliation. Id.  For the reasons that follow, this Court finds that summary judgment is inappropriate as to this claim.

A.   Plaintiff can establish a prima facie case of retaliation using the ongoing antagonism theory of causation.

To establish a prima facie case of retaliation, Plaintiff must demonstrate that (1) Plaintiff engaged in protected activity, (2) Defendants took adverse action against him, and (3) there was a causal connection between Plaintiff's participation in the protected activity and Defendants' adverse employment action. Id. For the purposes of the present Motion, Defendants acknowledge that Plaintiff can satisfy the first two elements of the prima facie standard. (Def. Mot. Sum. J., 18). Defendants challenge, however, Plaintiff's ability to establish a causal connection between his protected activity and his subsequent termination from Watco. (Def. Mot. Sum. J., 18). In the Third Circuit, to show causation Plaintiff must allege sufficient facts to demonstrate "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action; (2) a pattern of antagonism coupled with timing; or (3) other evidence gleaned from the record as a whole." Kriss v. Fayette Cnty., 504 F.Appx. 182, 188 (3d Cir. 2013) (internal citations omitted). Plaintiff cannot demonstrate the requisite causation on the basis of temporal proximity alone, and must rely on evidence of ongoing antagonism to establish the causal link between Plaintiff's protected activity and Plaintiff's subsequent termination from Defendants' company.

1.   **In the present case, temporal proximity alone is insufficient to establish causation.**

For the purposes of § 1981 claims of retaliation, "protected activity" encompasses both formal charges of discrimination as well as informal protests of discriminatory employment practices. Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006). By this Court's count, Plaintiff engaged in two protected acts of protest prior to his termination on October 10, 2014: Plaintiff's letter to Defendant Spiller on July 29, 2014, and Plaintiff's formal EEOC complaint filed on October 6, 2014. Retaliation for either complaint is

actionable under § 1981. Plaintiff was terminated seventy-three days (roughly two and a half months) following his July 29, 2014 protected activity, and four days following his October 6, 2014 protected activity. Neither party presents any evidence regarding the date on which Plaintiff made Watco aware of his pending EEOC complaint. Absent such evidence, Plaintiff cannot allege that knowledge of the EEOC complaint was the basis for his retaliatory discharge. Without consideration of Plaintiff's formal EEOC complaint, this Court is left to consider whether the two and a half months between Plaintiff's informal complaint to Defendant Spiller and Plaintiff's discharge on October 10, 2014 is unusually suggestive of retaliation.

It is under "narrow circumstances" that the proximity in time between the protected activity and the adverse employment action is sufficient, *on its own*, to establish the requisite causal connection. Gladysiewski v. Allegheny Energy, 398 F.Appx. 721, 724 (3d Cir. 2010). It is even narrower circumstances under which a two and half month proximity would suffice to create an inference of impermissible retaliation under §1981.  Plaintiff correctly notes that courts in this jurisdiction have found instances of unusually suggestive temporal proximity in cases involving larger stretches of time between protected conduct and termination. (Pl. Resp, 11); Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005)(regarding a three-month time span between the protected activity and the adverse employment action as short enough to find causation). And this Court does not suggest that a two and a half month period between protected activity and adverse employment action could never serve as the causal link necessary to infer retaliation.  Ultimately, whether the temporal proximity between Plaintiff's complaint of discrimination and Plaintiff's termination is sufficiently suggestive to create a presumption of unlawful retaliation is a highly fact sensitive inquiry. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000). The

court must consider "how proximate the events actually were, and the context in which the issue came before us." Id.

Given the facts of this case, this Court does not find the temporal proximity between Plaintiff's letter to Defendant Spiller and Plaintiff's subsequent discharge unusually suggestive of retaliation. The facts of this case do not give rise to the narrow circumstances under which a seventy three day timeline is, itself, sufficient to satisfy the causation element for a prima facie case under §1981. Absent additional evidence of retaliatory animus, the temporal link between Plaintiff's protected activity and Plaintiff's termination is too attenuated for a finding of retaliation.

> 2. **Under the "ongoing antagonism" theory of causation, Plaintiff can establish a causal link between Plaintiff's protected activity and subsequent discharge.**

"A plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." Woodson v. Scott Paper Co., 109 F.3d 913, 920-921 (3d Cir. 1997). Plaintiff alleges that throughout the months between his first complaint of discriminatory practices at Watco and his termination, Defendants engaged in persistent acts of retaliation against Plaintiff. (Pl. Resp., 12-13). It is undisputed that Plaintiff received no professional sanctions in the first four and a half months of his tenure at Watco. But in the two and a half months between Plaintiff's letter to Defendant Spiller alleging discriminatory employment practices and the date of Plaintiff's termination, Plaintiff was sanctioned no less than three times for alleged professional misconduct.

Beginning on July 29, 2014, the facts of this case read like a pendulum oscillating between Plaintiff's complaints of discriminatory employment practices and Plaintiff's disciplinary infractions. Plaintiff first complained of unjust employment practices on July 29, 2014. Less than a

month later, Plaintiff receives two formal warnings – one for unsatisfactory work and one for insubordination. On September 22, 2014, Plaintiff reported shift supervisor Plotts for allegedly encouraging Watco employees to retaliate against Plaintiff for an OSHA complaint Plaintiff initiated against the company. The next day Plaintiff was sanctioned for insubordination and a breach of personal conduct standards, and was suspended. On October 6, 2014 Plaintiff filed a formal EEOC complaint alleging race discrimination and retaliation. Four days later, Plaintiff was terminated.

Plaintiff maintains his innocence and alleges that each disciplinary action was motivated by retaliatory animus. A former Watco employee, who allegedly witnessed the altercation between Plaintiff and Joe O. that resulted in Plaintiff's suspension on September 23, 2014, submitted a sworn statement refuting Defendants' account of Plaintiff's alleged misconduct. Baranyay's statement further alleged a practice at Watco of retaliation against employees who "complain to management or engage in activities that management does not agree with." (Def. Ex. O).

The timing of these disciplinary actions, the signed statement of Pinder that a Watco supervisor encouraged retaliation against Plaintiff, and the sworn testimony of Baranyay that Watco grossly misrepresented Plaintiff's conduct on September 23, 2014 and routinely retaliated against oppositional employees together create the causal link necessary for a prima facie case of retaliation. Having established a prima facie case of retaliation, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for Plaintiff's termination.

     C.    <u>Plaintiff has adduced sufficient evidence for a reasonable fact finder to determine that Defendants' proffered reason for Plaintiff's discharge was pretext for unlawful retaliation.</u>

Under the burden shifting framework of <u>McDonnell Douglass</u>, Defendants must only articulate, not prove, a legitimate and non-retaliatory reason for Plaintiff's discharge. <u>McDonnell</u>

18

<u>Douglass</u>, 411 U.S. at 803. Defendants can undoubtedly meet that burden. As set forth in the preceding sections, Plaintiff received numerous warnings and increasing levels of discipline for alleged employee infractions. Beyond incidences of alleged insubordination, Plaintiff was accused and adjudged guilty by Watco Human Resources personnel of two serious altercations involving other Watco employees. As Defendants can satisfy their burden of production under <u>McDonnell Douglass</u>, the task that befalls Plaintiff is demonstrating that Defendants' proffered reason for terminating Plaintiff is pretext for impermissible retaliation.

Plaintiff can demonstrate pretext by presenting evidence that would allow the fact finder to either disbelieve Defendants' articulated reason for Plaintiff's termination or believe retaliatory animus was more likely than not the real reason for Plaintiff's discharge. <u>Jones</u>, 198 F.3d at 413. With the statements of Pinder and Baranyay, Plaintiff is able to present sufficient evidence upon which a reasonable fact finder could question the legitimacy of Plaintiff's professional sanctions, disbelieve Defendants' articulated reason for Plaintiff's discharge, and find unlawful retaliation. Baranyay's statement refutes Defendants' account of the September 23, 2014 incident between Plaintiff and Joe O., and suggests that Defendants routinely retaliate against employees who complain about perceived injustices. Pinder's statement suggests both knowledge among Watco's supervisory staff of Plaintiff's participation in protected activity and a stated interest by a Watco supervisor to retaliate. This evidence, in conjunction with Plaintiff's claims of innocence and the timing of Plaintiff's alleged employee infractions, is enough for a finding of retaliation.

It is not lost upon this Court that what Plaintiff alleges is, in essence, a large scale conspiracy by Watco employees, Human Resources personnel, and individual PES employees to lie about Plaintiff's conduct and secure Plaintiff's termination. For each of Plaintiff's alleged infractions, Watco's Human Resources department conducted independent investigations, took

witness statements, and conferred with Watco administrators before concluding that Plaintiff's conduct warranted formal sanctions. For Plaintiff's claims of innocence to be true, Plaintiff is necessarily alleging that Defendant Spiller, Ryder, Beasley, Howard, Joe O., Kevin O., Mike O., Leroy, and Harris are all colluding to frame Plaintiff. This Court wants to be clear that Plaintiff's assertions that he did not engage in the conduct for which he was disciplined would not, on their own, carry this claim of retaliation past the summary judgment phase. Fuentes v. Perksie, 32 F.3d 759, 765 (3d Cir. 1994). "[T]o discredit [Defendants'] proffered reason…[P]laintiff cannot simply show that the [Defendants'] decision was wrong or mistaken, since the factual dispute at issue is whether [retaliatory] animus motivated [Defendants], not whether [Defendants are] wise, shrewd, prudent, or competent." Id. at 765.  Instead, Plaintiff must adduce sufficient evidence to render Defendants proffered non-retaliatory explanation "unworthy of credence," such that a reasonable fact finder could infer that Defendants "did not act for the asserted non-[retaliatory] reason." Id. (internal citations omitted). Were it not for the statements of Carl Pinder and Greg Baranyay, Plaintiff could not so discredit Defendants' articulated reason for his discharge, and this Court would have no choice but to find that Plaintiff could not prove pretext and thus could not sustain his claim of retaliation.

Plaintiff is able to establish a prima facie case of unlawful retaliation and adduces sufficient evidence for a reasonable fact finder to conclude that retaliatory animus motivated Plaintiff's termination from Watco. Defendants are, therefore, not entitled to judgment as a matter of law with respect to Plaintiff's claim of unlawful retaliation in violation to 42 U.S.C. § 1981. Defendants' Motion for Summary Judgment is denied as to Plaintiff's claim of retaliation.

**<u>CONCLUSION</u>**

      For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part. Defendants' Motion is GRANTED as it relates to Plaintiff's §1981 claim of Racial Discrimination and is DENIED as it relates to Plaintiff's §1981 claim of Retaliation. An appropriate Order follows.

BY THE COURT:

<u>/s/ C. Darnell Jones, II          </u>
C. Darnell Jones, II    J.